**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Melissa Railey, | No. CV-14-02321-TUC-BGM |
| Plaintiff, | |
| v. | **ORDER** |
| Nancy A. Berryhill,<br>Acting Commissioner of Social Security, | |
| Defendant. | |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 17). Defendant filed her Brief ("Response") (Doc. 31), and Plaintiff filed her Reply Brief ("Reply") (Doc. 32). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). Compl. (Doc. 1). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

## I.    BACKGROUND

### A.    *Procedural History*

On July 22, 2011, Plaintiff filed a Title II application for Social Security Disability Insurance Benefits ("DIB") alleging disability as of November 2, 2010 due to chronic back pain, diabetes, cough, obesity, asthma, and status post left knee surgery. *See*

Administrative Record ("AR") at 13, 15, 21, 28, 52–53, 61, 65–67, 74, 137, 160, 162, 165, 183, 202. Plaintiff's date last insured is March 31, 2013. *Id.* at 15, 28, 53, 66, 160. The Social Security Administration ("SSA") denied this application on December 8, 2011. *Id.* at 13, 52–64, 78–81. Plaintiff filed a request for reconsideration, and on May 17, 2012, SSA denied Plaintiff's application upon reconsideration. *Id.* at 13, 65–77, 91–94. On May 21, 2012, Plaintiff filed her request for hearing. *Id.* at 13, 95. On January 9, 2013, a hearing was held before Administrative Law Judge ("ALJ") Lauren R. Mathon. AR at 13, 26–51. On February 1, 2013, the ALJ issued an unfavorable decision. *Id.* at 10–21. On March 28, 2013, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on July 10, 2014, review was denied. *Id.* at 1–3, 6–7.

On August 29, 2014, Plaintiff filed this cause of action. Compl. (Doc. 1). Plaintiff filed her Opening Brief (Doc. 17) on April 11, 2015. Defendant filed a Stipulated Motion to Remand (Doc. 21), which was granted by the Court. *See* Order 6/17/2015 (Doc. 24). Upon remand the Appeals Council again denied review, and the Parties moved to reopen this cause of action. *See* Stipulated Mot. to Reopen (Doc. 26). Defendant filed her response brief upon reopening of the case, and Plaintiff subsequently replied.

## B. Factual History

Plaintiff was thirty-eight (38) years old at the time of the administrative hearing and thirty-six (36) at the time of the alleged onset of her disability. AR at 19, 31, 52–53, 61, 65–66, 74, 137, 160, 183, 202. Plaintiff graduated from high school and completed approximately one (1) year of college. *Id.* at 19, 34–35, 76, 165. Prior to her alleged disability, Plaintiff worked as a medical assistant, phlebotomist, kids club advisor, teacher, and cashier. *Id.* at 35, 62–63, 75, 166, 172–79.

### 1. Plaintiff's Testimony

#### a. Administrative Hearing

At the administrative hearing, Plaintiff testified that she lives with her children, ages fourteen (14), eleven (11), and two (2). AR at 31–32. Plaintiff further testified that

she feeds and clothes her two (2) year old, as well as spends time with him, including watching television. *Id*. at 32. Plaintiff also testified, however, that she seldom does his laundry, and rarely cleans the house or cleans his room. *Id*. at 32–33. Plaintiff testified that she does grocery shop. *Id.* When asked why she began adoption of a newborn at the time that she became disabled, Plaintiff explained that the child was her great-nephew, and there were no other relatives with a clean background able to take him in. *Id*. at 37–38. Plaintiff further explained that her extended family gave her more help and support during that time. AR at 38.

Plaintiff testified that the older children walk to school, and that she is able to attend meetings at school for them. *Id*. at 33. Plaintiff further testified that she rarely takes the children anywhere on the weekend. *Id*. Plaintiff also testified that the older children have medical conditions requiring her to monitor their daily medication. *Id*. at 33–34. Plaintiff noted that the older children help with the household chores. *Id*. at 34.

Plaintiff testified that she has a high school education, plus one (1) year of college. AR at 34. Plaintiff further testified that she supported herself since her alleged onset date by receiving cash assistance, food stamps, and child support. *Id*. at 35. Plaintiff stated that she drives a maximum of approximately three (3) days per week. *Id*. Plaintiff also testified that she has not traveled anywhere beyond Tucson since her alleged onset date. *Id.*

Plaintiff testified that her last job was in October of 2008, working as a medical assistant and phlebotomist. *Id*. Plaintiff further testified that she had to stop working because of her chronic cough, which prohibited her from working with patients. AR at 35. Plaintiff said that she had applied for medical assistant positions since then, despite her cough, because it was the only position for which she was trained. *Id*. at 35–36. Plaintiff also stated that she had also worked as a certified nurse's assistant, as a childcare worker, and in retail. *Id*. at 36. Plaintiff testified that she can stand for approximately five (5) to ten (10) minutes at a time, and can walk for approximately one half of a block before needing to rest. *Id.* at 36. Plaintiff further testified that walking and standing

results in shortness of breath and severe lower back pain.  *Id.* at 37.  Plaintiff also testified that she could sit in a chair for approximately three (3) to five (5) minutes before needing to change positions, but noted that her chronic cough was an impediment to performing any work on the telephone.  AR at 37.

Plaintiff testified that she sees Drs. Sakali and LaHood, asthma and allergy specialists, for treatment of her cough.  *Id.* at 38–39.  Plaintiff indicated that her treatment originally involved allergy shots; however, she was allergic to the shots, so she was prescribed two (2) different inhalers, a nebulizer, and a nasal spray.  *Id.* at 39.  Plaintiff described Nurse Practitioner McLeod as her primary care physician, and confirmed that she was still treating with Drs. Raysford and Gorman.  *Id.*

### b. Administrative Forms

Plaintiff completed a Function Report—Adult in this matter.  AR at 165–71.  Plaintiff described her medical conditions as "[a]rthritis in lower back, asthma, allergies, diabetes, etc."  *Id.* at 165.  Plaintiff noted her last day of work as October 1, 2007, and attributed her stopping work to her medical conditions.  *Id.*  Plaintiff reported her highest grade of school completed as one (1) year of college.  *Id.*  Plaintiff listed her prior work history as including medical assistant, child care, certified nursing assistant, cashier, and beauty advisor.  *Id.* at 166.  Plaintiff reported her medications as Advair Diskus, altrovent inhaler, Folic acid, Glimepiride, Hydroxyzine pamoate, Intal inhaler, LANTUS/Insulin, Metformin, omeprazole, and pain medication.  AR at 168.

Plaintiff also completed an Exertional Daily Activities Questionnaire.  *Id.* at 180–82.  Plaintiff reported that she lived in a house with her children.  *Id.* at 180.  Plaintiff described her average day as waking up, getting her children up for school, eating breakfast, taking her medication, and waiting for a family member of friend to come over and help her with the baby, laundry, and cleaning.  *Id.*  Plaintiff also stated that during a typical day she would take a nap for approximately thirty (30) minutes.  *Id.*  Plaintiff further reported that she would help her children with their homework, make dinner when she could, watch television or read with the kids, try to walk outside, come home, take a

shower, and try to get some rest.  AR at 180.

Plaintiff described her symptoms to include "[s]hortness of breath, when [she] walk[s] a short distance[;] [b]ack pain when[] [she] walk[s], sit[s], lay[s] down, [a] lot of time it takes [her] about 10–15 min[utes] to get out of the bed[;] [a]llergies stayed flarred [sic] up witch [sic] is what causes [her] to have a crhonic [sic] cough, and make[s] it harder on [her] asthma." *Id.*  Plaintiff stated that she "tr[ies] to walk [a]bout a block before [she] [is] short of breath[,] [and] [it] takes [her] about 30 min[utes] to go around the block[.]" *Id.*  Plaintiff further stated that she "can lift thigs [sic] that hardly have any weight to [them][,] [and] [] can carry the baby back pack[,] [but] lifting a gallon [of] milk can most of [the] time make the pain in [her] back sharper[.]" *Id.* at 181.  Plaintiff indicated that she can "sometimes" perform household chores, including folding laundry while seated, and cooking meals.  *Id.*  Plaintiff noted, however, that standing during cooking "cause[s] excruciating pain in [her] back[.]" AR at 181.  Plaintiff also reported that she has difficulty finishing housework and chores, because she "can do very little before [] get[ting] shortness of breath and [her] back [] hurting excruciating[ly]."  *Id.*

Plaintiff stated that she does drive, but can only do so for approximately twenty (20) minutes, "before [her] back starts hurting really ba[d]."  *Id.*  Plaintiff noted that she tries to walk, but can only go about "a block before [she] [is] out of breath [and her] back hurting[.]"  *Id.*  Plaintiff reported that her ability to do chores or activities has changed since becoming disabled.  *Id.*  Further, Plaintiff indicated that she sleeps approximately three (3) to four (4) hours per night, and requires periodic rests or naps during the day, "[d]epending on the sharpness of pain and shortness of breath."  AR at 181.  Plaintiff listed her medication to include Rena-vite, B-12, omeprazole, Vitamin D$_3$, codeine sulfate, Balclofen, and ADIPEX-P.  *Id.* at 182.

With her appeal forms, Plaintiff completed a check box form indicating her abilities.  *Id.* at 200.  Regarding caring for pets or other people, Plaintiff indicated that she could not carry heavy bags of food; bend down to feed and water the pets; pick up her children; or play with them of the floor.  *Id.*  Plaintiff further indicated that she could pick

up toys and care for other people "only sometimes." *Id.* Regarding her personal care, Plaintiff reported that she never slept well, and could "only sometimes" button and zip her clothing; put on socks and shoes; stand in the shower; wash her back, feet, and hair; and clean herself after using the toilet. AR at 200. Regarding cooking, Plaintiff indicated that she could not stand for long periods of time in front of the stove or sink; reach up high, or bend down low; or lift and carry heavy, hot items. *Id.* Plaintiff noted that she could understand and follow recipes or other written instructions; use knives to prepare food; and wash dishes without dropping and breaking them "only sometimes." *Id.* Regarding cleaning her living space, yard, and clothes, Plaintiff reported that she could never use a broom, mop, and vacuum cleaner; clean more than one room at a time without resting; move furniture; carry heavy laundry baskets; lift wet clothes out of the washer; or bend to put clothes in the dryer. *Id.*

Plaintiff reported that regarding driving and getting around she could drive herself to appointments or without limitations only sometimes, and could never sit for long periods of time; take a trip without stopping frequently to get out of the car; or take a bus by herself. *Id.* at 201. Regarding shopping for groceries, Plaintiff indicated that she could never walk for long periods of time without resting; take heavy bags out of the car and load them into the car; carry heavy bags into the house and put the things away; handle lots of people around her; or stand in line for long periods of time. AR at 201. Additionally, Plaintiff indicated that she could only sometimes get up and walk again after resting just a few minutes. *Id.* In addressing cognitive and emotional problems, Plaintiff reported that she could only sometimes remember when to pay the bills; remember her appointments; follow spoken instructions; pay attention or concentrate; always understand what is going on; finish things that she started; handle changes in routine; and accepting criticism. *Id.* Plaintiff reported not being able to do her favorite hobbies or use her hands to type for long periods of time, and only sometimes able to use her hands to pick up and use small items. *Id.* Finally, Plaintiff noted that she could no longer do the social activities that she used to enjoy or go places by herself, and only

sometimes gets along with people. *Id.*

Additionally, Plaintiff completed a Work History Report. AR at 172–79. Plaintiff listed her jobs prior to the alleged onset of her disability to include medical assistant/phlebotomist, beauty advisor, kids club advisor, teacher, cashier, crossing guard, and bus monitor. *Id.* at 172. Plaintiff reported that as a medical assistant/phlebotomist she would "greet patients[;] take vitals[;] take or assist [patient] to assigned room[;] collect history notes[;] give [patient] shots as request[ed] by physician[;] assist [doctor] in minor surgeries[;] [and] draw blood [for lab work][.]" *Id.* at 173. Plaintiff further reported that this job required machines, tools, or equipment; technical knowledge or skills; and that she wrote or completed reports. *Id.* Plaintiff also reported that she walked, stood, or stooped, for approximately eight (8) hours per day. *Id.* Plaintiff indicated that she also occasionally lifted patients onto the table, and that she also carried boxes of supplies from the supply room to the patient rooms. AR at 173. Plaintiff noted that the heaviest weight she lifted was fifty (50) pounds, and she frequently lifted less than ten (10) pounds. *Id.*

Plaintiff reported that as a beauty advisor she performed customer service, ran a cash register, and set up displays. *Id.* at 174. Plaintiff further reported that in this position she used machines, tools, or equipment; technical knowledge or skills; and wrote or completed reports. *Id.* Plaintiff also reported that in this position she walked; stood; kneeled; crouched; crawled; handled big objects; and stooped for at least half her work day. *Id.* Plaintiff indicated that in addition to working the cash register, she packaged products, restocked shelves, and retrieved products for customers. Plaintiff reported that the heaviest weight she lifted was fifty (50) pounds, and she frequently lifted less than ten (10) pounds. AR at 174.

Plaintiff reported that as a kids club advisor she provided coordinated activities and projects for children, as well as played with them and maintained a safe environment for them while their parent worked out at the fitness club. *Id.* at 175. Plaintiff described her job as requiring the use of machines, tools, or equipment; technical knowledge or

skills; and writing or completing reports.  *Id*.  Plaintiff further reported the job required her to walk; stand; sit; stoop; kneel; crouch; crawl; handle both large and small objects; and reach.  *Id.*  In this position, Plaintiff regularly lifted infants and toddlers.  *Id.*  Plaintiff reported that in this position the heaviest weight she lifted was fifty (50) pounds, and she frequently lifted twenty-five (25) to fifty (50) pounds.  AR at 175.

Plaintiff described her position as a teacher as "car[ing] for and teach[ing] children and toddlers, prep[aring] them for kindergarten[.]"  *Id.* at 176.  Plaintiff noted that she worked with children between two (2) and five (5) years of age, and that this work also required her to potty train some children.  *Id.*  Plaintiff reported that this job required the use of machines, tools, or equipment; technical knowledge or skills; and writing or completing reports.  *Id.*  Plaintiff indicated that the job required her to walk; stand; sit; stoop; crouch; handle, grab or grasp both large and small objects; and reach.  *Id.*  Plaintiff reported that she carried toddlers, as well as toys, books, tables, and other equipment on a daily basis.  AR at 176.  Plaintiff stated that the heaviest weight she lifted was approximately fifty (50) pounds, and that she frequently lifted between twenty-five (25) and fifty (50) pounds.  *Id.*

Plaintiff described her position as a cashier as taking customer orders; collecting money for those orders; preparing meals; stocking items; and cleaning, including sweeping and mopping the dining area, cleaning windows, and cleaning restrooms.  *Id.* at 177.  Plaintiff reported that this job required the use of machines, tools, or equipment; technical knowledge or skills; and writing or completing reports.  *Id.*  Plaintiff further reported that the job required her to walk; stand; stoop; kneel; crouch; reach; and handle small objects frequently and large objects only occasionally.  *Id.*  Plaintiff noted that she lifted meals, sometimes delivering them to the customer's table; carried large tea dispenser from the lobby to the back of the restaurant; and carried frozen food items from the walk-in freezer to the cooking area.  AR at 177.  Plaintiff indicated that the heaviest weight she lifted was approximately twenty (20) pounds, and that she frequently lifted ten (10) pounds or less.  *Id.*

Plaintiff described her position as a cashier, stocker, and beauty advisor as running the cash register, stocking items, performing an inventory, revising shelves, and customer service. *Id.* at 178. Plaintiff reported that this position required the use of machines, tools, or equipment; technical knowledge or skills; and writing or completing reports. *Id.* Plaintiff also reported that the job required her to walk, stand, and stoop frequently. *Id.* Plaintiff noted that she was also required to kneel, crouch, crawl, reach, and handle large and small objects, with varying frequency. AR at 178. Plaintiff indicated that she was required to carry items to the register or move them to other areas of the store. *Id.* Plaintiff reported the heaviest weight she lifted as fifty (50) pounds, and that she frequently lifted twenty-five (25) pounds or less. *Id.*

## 2. Vocational Expert Kathryn Atha's Testimony

Ms. Kathryn A. Atha testified as a vocational expert at the administrative hearing. AR at 13, 40–50. Ms. Atha described Plaintiff's past work in a retail store as a beauty advisor as a salesperson of cosmetics and toiletries, Dictionary of Occupational Titles ("DOT") number 262.357-018, as light work, semi-skilled, and a Specific Vocational Preparation ("SVP") of 4. *Id.* at 40. Ms. Atha described Plaintiff's past work as a retail sales clerk, DOT number 290.477-014, light work, and an SVP of 3. *Id.* Ms. Atha described Plaintiff's past work of a nurse assistant, DOT number 355.674-014, as medium work, SVP of 4, and semi-skilled. *Id.* at 41. Ms. Atha described Plaintiff's past work of medical assistant as DOT number 079.362-010, light work, SVP of 6, and skilled, and phlebotomist as DOT number 079.364-022, also light work, and an SVP of 3. *Id.* Ms. Atha described Plaintiff's past work as a child daycare center worker as DOT number 359.677-018, light work, semi-skilled, and an SVP of 4. AR at 41. Ms. Atha also discussed Plaintiff's past work as a school crossing guard and school bus monitor; however, neither of these were full-time employment. *Id.* at 41–43.

The ALJ asked Ms. Atha about a hypothetical individual with the same age, education, and vocational background as Plaintiff. *Id.* at 43. The ALJ then asked Ms. Atha to describe any past work or other work for such an individual, with the additional

limitations of being able to "lift and/or carry 50 pounds occasionally, 25 pounds frequently; can stand and/or walk six hours in an eight hour day; postural limitations are never climb ladders, ropes, scaffolds; can frequently climb ramps, stairs, balance, stoop, kneel, crouch and crawl[,] [a]nd environmental limitations are avoid concentrated exposure to cold, heat, vibration, fumes, odors, dust, gases, poor ventilation[,] and hazards." *Id*. at 43–44. Ms. Atha testified that such an individual would be able to do the jobs represented by Plaintiff's past relevant work. *Id.* at 44. The ALJ posed another hypothetical encompassing the previous one, but with the additional limitation of light work. AR at 44. Ms. Atha testified that all of Plaintiff's past relevant work could be performed, with the exception of nurse assistant. *Id*. The ALJ then modified the light work limitation to sedentary work. *Id.* Ms. Atha testified that such an individual could work as an appointment clerk, DOT number 237.367-010, semi-skilled, an SVP of 3, and sedentary. *Id.* Ms. Atha also indicated that a receptionist, DOT number 237.367-0368, an SVP of 4, and sedentary, would be available to such an individual. *Id*. at 44–45.

The ALJ also re-asked Ms. Atha each hypothetical, but included the additional limitation on avoiding working with the public. AR at 45–47. For medium exertional level jobs, Ms. Atha testified that Plaintiff could work as a kitchen helper, DOT number 318.687-010, with an SVP of 2. *Id.* at 45–46. Ms. Atha also testified that Plaintiff could be a warehouse worker, DOT number 922.687-058, medium work, with an SVP of 2. *Id.* at 46. Regarding possible jobs at the light exertional level, again avoiding the public, and with all prior restrictions, Ms. Atha testified that Plaintiff could work as a hotel maid, DOT number 323.687-014, unskilled, with an SVP of 2, or as a production assembler, DOT number 706.687-010, with an SVP of 2. *Id.* For such a hypothetical individual, but limited to sedentary work and avoiding the public, Ms. Atha testified that Plaintiff could work as a toy stuffer, DOT number 761.685-014, with an SVP of 2, or as a nut sorter, DOT number 521.687-086, also with an SVP of 2. *Id.* at 47.

The ALJ posed a final question regarding possible work for a hypothetical individual with the same age, education, and vocational background as Plaintiff, and the

"[a]bility to stand during an eight hour period, two hours or less; ability to walk at one time before needing to stop, less than one block; never carry 10 pounds; never carry 20 pounds[,] . . . [and sitting for] 15 minutes to 30 minutes or less[,] [but] . . . [without a] capacity maximum during the day of sitting."  AR at 48.  Ms. Atha testified that she needed more information in order to form an opinion regarding such an individual.  *Id.*

Plaintiff's counsel asked Ms. Atha about the availability of jobs for a hypothetical person as described in the ALJ's final hypothetical, but with the limitation that such an individual could "sit for the entire day, but she can sit at one time for less than 15 to 30 minutes and then she needs to take a five minute[] break and then go back to sitting, but primarily she'll be sitting."  *Id.* at 49.  Ms. Atha testified that the sedentary, unskilled jobs of toy stuffer and nut sorter would be available to such a person.  *Id.* at 49–50.  Ms. Atha further testified that her testimony was consistent with her personal training and experience, as well as her interpretation of the Dictionary of Occupational Titles.  *Id.* at 50.

### **3. Plaintiff's Medical Records**

#### **a. Treatment records**

On October 28, 2008, Plaintiff was seen by Nabeeh N. LaHood, M.D. at Allergy, Asthma Associates, P.C. upon referral by NP McLeod.  AR at 259–60.  Plaintiff was seen regarding her allergies, and Dr. LaHood's physical examination of her was unremarkable. *Id.* at 259.  Dr. LaHood noted his impression that Plaintiff had "allergic rhinitis, allergic conjunctivitis, asthma, atopic dermatitis, and questionable food allergy."  *Id*. at 259–60. Dr. LaHood performed a pulmonary function tests on Plaintiff before and after a bronchodilator, both of which were within normal limits.  *Id*. at 260.  Dr. LaHood also performed food and aeroallergy testing on Plaintiff.  *Id.*  Dr. LaHood reported that food testing revealed Plaintiff to be positive to cherry, egg white, peanut, soybean, trout fish, codfish, grapefruit, pecan, tuna fish, cabbage, cucumber, avocado, and hazelnut.  AR at 260.  Additionally, "[t]he aeroallergy testing revealed that [Plaintiff] was strongly allergic to all of the grasses, trees[,] and many weeds and molds she was tested for in addition to

cat dander and cockroach." *Id.* Dr. LaHood prescribed Flonase, Advair, prednisone, and Atarax, as well as starting Plaintiff on allergy immunotherapy. *Id.*

On November 11, 2008, Plaintiff saw Dr. LaHood for her allergies. *Id.* at 258. Dr. LaHood noted that Plaintiff "stated that she ha[d] been doing fairly well." *Id.* Dr. LaHood further reported that Plaintiff's atopic dermatitis had been stable. AR at 258. Additionally, he advised her to continue the allergy immunotherapy and the medications he had prescribed. *Id.*

On January 29, 2009, Plaintiff saw Dr. LaHood regarding her allergies, and reported that she "ha[d] been having a cough for a couple of months[,] . . . [and] was started on Z-Pak [the previous day.]" *Id.* at 257. Dr. LaHood noted his impression that Plaintiff "ha[d] asthma, allergic rhinitis, allergic conjunctivitis[,] and resolving bronchitis." *Id.* Plaintiff underwent pulmonary function tests before and after a bronchodilator which were within normal limits. *Id.* Dr. LaHood "advised her to take GE reflux measures[,] [and] . . . started her on Atrovent two puffs three times per day to improve her cough secondary to GE reflux, [and] Singulair 10 mg every evening." AR at 257. Dr. LaHood also informed Plaintiff to continue the allergy immunotherapy. *Id.*

On February 4, 2009, Plaintiff was seen by Sam E. Sato, M.D. for an ophthalmological evaluation. *Id.* at 300–05. Plaintiff reported a history of her right eye wandering out. *Id.* at 301. Plaintiff further reported having tried glasses and eye exercises in the past without improvement. *Id.* Plaintiff stated that her condition causes eyestrain when trying to read, and she sees double. AR at 301. Dr. Sato noted that Plaintiff's external exam was normal; however, corrective surgery was required. *Id.* Dr. Sato also noted his concern that Plaintiff may develop glaucoma based on her asymmetrical optic nerve cups. *Id.*

On April 24, 2009, Plaintiff underwent surgery for Exotropia at Camp Lowell Surgery Center. *Id.* at 230, 316, 318. Sam Sato, M.D. performed a five (5) millimeter, bilateral, lateral rectus recession. *Id.* at 230–48, 318–19. The surgery was unremarkable, and Plaintiff was discharged home the same day. AR at 244.

On May 14, 2009, Plaintiff returned to see Dr. LaHood for a follow-up. *Id.* at 256. Dr. LaHood noted that Plaintiff stated the she "feels better since she has been on immunotherapy with decreased congestion and mild sneezing[,] [and] [s]he [has] also noticed a significant decrease in her postnasal drip and no coughing." *Id.* Dr. LaHood's physical examination of Plaintiff was unremarkable, and he noted his impressions of asthma, allergic rhinitis, and allergic conjunctivitis. *Id.* Dr. LaHood outlined his treatment plan for Plaintiff as continuing "immunotherapy per protocol and Advair Diskus 250/50 once a day[,] . . . [as well as] Intal twice a day and albuterol as needed for shortness of breath." *Id.* Plaintiff also saw Dr. Sato for a follow-up the same day. AR at 298–99. Dr. Sato that Plaintiff's eyes were better than prior to surgery; however, she still had intermittent exotropia. *Id.* at 299.

On June 11, 2009, Plaintiff again followed-up with Dr. Sato. *Id.* at 296–97. Dr. Sato noted that Plaintiff was a glaucoma suspect due to "an enlarged cup-to-disk ratio and ocular hypertension." *Id.* at 296. Plaintiff reported that her right eye was still drifting, and she did not have glasses. *Id.* Dr. Sato contemplated a right medial rectus resection. AR at 296.

On July 30, 2009, Plaintiff followed-up with Dr. Sato. *Id.* at 294–95. Plaintiff reported that she still sees her eyes drifting and is still getting image jump and eyestrain. *Id.* Dr. Sato noted that they were considering additional eye muscle surgery. *Id.*

On September 18, 2009, Plaintiff saw Bobbie Jo Smalley, O.D. *Id.* at 291, 293. Plaintiff reported severe headaches with increased exotropia. *Id.* at 293. Dr. Smalley recommended a consecutive eye muscle surgery, but wanted Plaintiff to follow-up with Dr. Sato for his recommendation. AR at 291. On September 30, 2009, Plaintiff was seen by Dr. Sato who discussed the medial rectus resection procedure in detail. *Id.* at 292.

On October 12, 2009, Plaintiff saw Dr. Smalley on an emergency basis. *Id.* at 290. Plaintiff reported that she had been seen in the emergency department, because her eye had started to get swollen and very painful. *Id.* at 290. Plaintiff further reported that she had been told that she had herpes in her eye, and was given a prescription which are

insurance did not cover. *Id.* On October 14, 2009, Plaintiff returned for her two day follow-up regarding the right herpetic blepheral cellulitis. AR at 287, 289. Dr. Smalley had prescribed Vigamox drops, bacitracin ointment, and a course of Acyclovir. *Id.* at 287. Dr. Smalley reported that Plaintiff's right eyelid was markedly improved. *Id.* On October 20, 2009, Plaintiff again followed up regarding her right herpetic blepheral cellulitis. *Id.* at 288. Dr. Smalley reported that she was doing much better, with only mild symptoms. *Id.*

On November 12, 2009, Plaintiff returned to Dr. LaHood "with complaints of a cough, postnasal drip, sinus pressure headaches, and occasional heartburn." AR at 255. Dr. LaHood noted that Plaintiff "stopped her immunotherapy secondary to her current reactions." *Id.* Dr. LaHood's physical examination of Plaintiff was unremarkable, and he noted his impressions to include "allergic rhinitis, allergic conjunctivitis, GERD, and asthma." *Id.* Dr. LaHood "recommended [Plaintiff] to use nasal steroids and antihistamines." *Id.* Dr. LaHood also prescribed Clarinex instead of over-the-counter antihistamines, and continued Plaintiff's use of Advair Diskus 250/50 and Singulair, with the addition of omeprazole. *Id.* On November 20, 2009, Plaintiff returned to Camp Lowell Surgery Center for a four (4) millimeter, bilateral, medial rectus recession. AR at 211–29, 284–86, 317. Dr. Sato again performed the surgery, and Plaintiff was discharged home the same day. *Id.* at 211, 225, 285, 317.

On December 2, 2009, Plaintiff returned to Dr. Sato for a postoperative follow-up. *Id.* at 282–83. Plaintiff reported or double vision improved. *Id.* at 282. On December 16, 2009, Plaintiff again saw Dr. Sato. *Id.* at 280–81. Dr. Sato noted that Plaintiff was doing much better overall, and was pleased with the results. *Id.* at 280. Dr. Sato further reported that Plaintiff's I looked good, she no longer had double vision, but did feel some pulling medially. AR at 280. On the same date, Plaintiff was seen by Kathleen McLeod, F.N.P., for an annual exam. *Id.* at 331–33. Plaintiff reported that her eye surgeries had been successful, but complained of being constantly tired, and suffering low back pain. *Id.* at 331. Upon examination, NP McLeod noted Plaintiff was positive for fatigue, ear

pain, sore throat with swollen right tonsil, postnasal drip, and cough with dark yellow/green phlegm. *Id.* at 331–32. NP McLeod ordered lab work, and instructed Plaintiff to exercise and follow a low fat diet. *Id.* at 332–33. On December 18, 2009, Plaintiff returned to NP McLeod complaining of earache and sore throat. AR at 334–35. NP McLeod assessed an upper respiratory infection and pharyngitis. *Id.* at 334. NP McLeod prescribed azithromycin and pseudoephedrine, and recommended zinc, rest, and fluids. *Id.* at 334–35. On December 22, 2009, Plaintiff was seen by Dr. Sato, who removed medially exposed sutures from her eye. *Id.* at 314–15.

On January 4, 2010, Plaintiff followed-up with Dr. Sato regarding the exposed suture removal. *Id.* at 312–13. Dr. Sato's notes were otherwise unremarkable. AR at 312–13. On January 12, 2010, Plaintiff returned to Dr. Sato for a follow-up post suture removal. *Id.* at 310–11. Plaintiff reported some redness, no change, no pain, no irritation currently, but had experienced "a little" scratchiness, small migraines and a feeling of "pressure." *Id.* at 310. Dr. Sato ordered baseline testing. *Id.* at 311. On January 15, 2010, Plaintiff was seen by NP McLeod to review her laboratory results. *Id.* at 336–39. NP McLeod assessed diabetes and cough, referring Plaintiff to diabetic education and to an ENT consult. AR at 338–39. NP McLeod prescribed Metformin and Albuterol. *Id.* at 339. On January 23, 2010, Plaintiff again followed-up with Dr. Sato. *Id.* at 308–09. Plaintiff reported feeling an irritation, possibly a suture, without pain. *Id.* at 308. Dr. Sato noted a sub-conjunctival cyst, which he removed and cauterized in the office. *Id.* at 309. On January 28, 2010, Plaintiff returned to Dr. Sato post cyst removal. AR at 278–79. Some continued redness, but also improvement were noted; however, Plaintiff had to leave after initial intake. *Id.* at 276, 278. On January 29, 2010, Plaintiff followed up with NP McLeod regarding her diabetes. *Id.* at 340–41. Plaintiff had no questions regarding diabetes; however, complained of her face feeling hot, feeling like she has a cold without symptoms, no energy, difficulty stopping bleeding after stepping on a tack, and intermittent paresthesias in both legs and feet. *Id.* NP McLeod's examination of Plaintiff was unremarkable. *Id.* at 341.

On February 1, 2010, Plaintiff returned to Dr. Sato to complete her follow-up post cyst removal.  AR at 276–77.  Dr. Sato noted that Plaintiff was "finally doing well[,]" with no significant issues at the time of the appointment.  *Id.* at 277.  On February 5, 2010, Plaintiff was seen by A. J. Emami, M.D., FACS at Valley ENT, upon referral by NP McLeod.  *Id.* at 251.  Dr. Emami reported that Plaintiff "had a significant degree of problems with chronic cough for the last two years."  *Id.*  Dr. Emami further noted that she had "tried all types of allergy medications as well as omeprazole and cough syrup without any significant improvement."  *Id.*  Dr. Emami also noted that Plaintiff had some shortness of breath, had been on multiple different inhalers, as well as allergy shots.  AR at 251.  Dr. Emami's examination of Plaintiff was unremarkable, and he noted that there was no "need for any significant ENT intervention[.]"  *Id.*  On February 23, 2010, Plaintiff again followed-up with Dr. Sato.  *Id.* at 272–75, 320–27.  Plaintiff reported her right eye was drifting more when tired, and that she was experiencing an increased pressure on the eye.  *Id.* at 272, 274.  Dr. Sato also performed glaucoma screening tests in light of Plaintiff's risk.  *Id.* at 272, 320–27.  Dr. Sato noted that Plaintiff did not have glaucoma, and here screening tests were stable.  AR at 272.

On March 3, 2010, Plaintiff followed-up with Dr. LaHood.  *Id.* at 254.  Plaintiff reported "occasional exacerbations with coughing and mild postnasal drip and congestion."  *Id.*  Dr. LaHood's physical examination of Plaintiff was unremarkable, and he noted his impressions of "allergic rhinitis, allergic conjunctivitis, and asthma."  *Id.*  Dr. LaHood further noted that Plaintiff "had not improvement on the current medications[,] . . . [and that she] did not tolerate immunotherapy secondary to recurrent reactions.  *Id.*  Dr. LaHood changed Plaintiff's prescriptions, and sent "lab work for a valley fever serology work-up."  AR at 254

On April 21, 2010, Plaintiff returned to Dr. Sato for a follow-up.  *Id.* at 270–71.  Plaintiff complained of continued eye pressure, as well as feeling a little drifting.  *Id.* at 270.  Examination of Plaintiff was otherwise unremarkable, and she was given another prescription.  *Id.* at 270–71.

On May 20, 2010, Plaintiff followed up with NP McLeod regarding her diabetes and to discuss weight loss issues. *Id.* at 342–46. NP McLeod noted that Plaintiff had recently gained custody of her niece and her niece's three (3) month old son, but her niece had run away leaving Plaintiff with the baby. *Id.* at 342. NP McLeod noted that Plaintiff was positive for chills and fatigue, post nasal drip, and an intermittent cough. AR at 343. NP McLeod's physical examination of Plaintiff was otherwise unremarkable. *Id.* at 344.

On June 12, 2010, Plaintiff was seen by Dr. Sato on an emergency basis. *Id.* at 267–69. Plaintiff reported straining of the right eye, continuous headaches, pressure behind both eyes, and trouble with distance visual acuity. *Id.* at 267–68. After examination, Dr. Sato recommended convergence exercises to improve Plaintiff's intermittent exotropia. *Id.* at 267, 269.

On September 2, 2010, Plaintiff was seen by Pierre Sakali, M.D. regarding her "shortness of breath and mild coughing." AR at 354–56. Plaintiff reported that she "had a lot of stress over the last few months and [was] wondering if anxiety could be triggering her symptoms." *Id.* at 354. Dr. Sakali's review of Plaintiff's systems was unremarkable, and physical examination showed "mild nasal turbinate enlargement, postnasal drip, and end-expiratory wheezing with no rhonchi." *Id.* Dr. Sakali's impression included "asthma, a chronic cough, allergic rhinitis, allergic conjunctivitis, and possible anxiety." *Id.* Dr. Sakali performed a pulmonary function test, which was in the normal range. *Id.* Dr. Sakali increased Plaintiff's Advair HFA prescription, and advised her to speak with NP McLeod regarding "the possibility of evaluation and treatment of anxiety and depression." AR at 354. On the same date, Plaintiff followed up with NP McLeod regarding her diabetes mellitus. *Id.* at 347–52. Plaintiff complained of feeling short of breath, and reported that her allergist told her that she may be having an anxiety attack. *Id.* at 347. Plaintiff further reported that her shortness of breath began on the day of her brother's funeral. *Id.* Plaintiff also complained of intermittent lightheadedness with coughing and sore throat. *Id.* Plaintiff indicated that she was "going to the gym up to 4x

weekly for 2 hours[,] [but] [n]o weight loss, and she is still very tired." AR at 347. NP McLeod's physical examination of Plaintiff was generally unremarkable, but noted small amounts of exudate on both tonsils, plus post nasal drip. *Id.* at 349. NP McLeod ordered additional labs, and noted that Plaintiff declined referral to behavioral health or grief counseling. *Id.* at 351.

On February 25, 2011, Plaintiff had a chest x-ray due to "[a]sthma, unspecified respiratory abnormality, [and] acute bronchospasm." *Id.* at 391. Gary Podolny, M.D. read the films and found no active cardiopulmonary disease. *Id.* Additionally, Dr. Podolny compared the films to a March 12, 2009 film, and found no change. AR at 391.

On May 10, 2011, Plaintiff had a chest x-ray due to "[p]ersistent cough." *Id.* at 390. Shaun P. McManimon, M.D. read the films, which were unremarkable. *Id.* at 390. Dr. McManimon also compared the films with the February 25, 2011 films, and found Plaintiff's "[h]eart and mediastinum [were] within normal limits[,] [n]o focal infiltrate or mass[,] [and] [n]o obvious bronchial wall thickening." *Id.* On May 24, 2011, Plaintiff was seen by NP McLeod regarding her diabetes mellitus. *Id.* at 377–89. Plaintiff reported having trouble with eating, complained of fatigue, and stated that she was walking a mile to a mile and a half per day. AR at 377. Plaintiff also complained of postnasal drip, back pain when sitting, and persistent headaches. *Id.* at 378. NP McLeod's physical examination was unremarkable, and Plaintiff did not exhibit any pain upon palpation of her back or with leg extensions. *Id.* at 379. NP McLeod noted her leg strength as 5/5 bilaterally. *Id.* NP McLeod ordered lab work to be done. *See id.* at 379–89.

On August 4, 2011, Plaintiff followed up with NP McLeod regarding her diabetes mellitus. AR at 372–76. Plaintiff reported her walking had decreased to approximately a quarter mile per day due to back pain. *Id.* at 372. Plaintiff further reported that she was stretching her back on a ball. *Id.* Plaintiff also stated that she is "[u]nable to vacuum, mop[,] and other home duties due to the pain." *Id.* at 372. NP McLeod noted that a January magnetic resonance imaging ("MRI") showed "arthritic changes," but was

otherwise unremarkable. *Id.* Plaintiff reported that she is fine until she bends, but then cannot straighten. AR at 372. Plaintiff also reported physical therapy, ibuprofen, and muscle relaxers were ineffective. *Id.* NP McLeod noted that Plaintiff was positive for fatigue, but no other issues were noted. *Id.* at 374–75. On August 29, 2011, Plaintiff was seen by Caryl S. Brailsford-Gorman, M.D. at Tucson Orthopaedic Institute. *Id.* at 395–97. Plaintiff complained of back pain in her low back and buttocks, without a specific inciting event. *Id.* at 395. Plaintiff reported aggravated symptoms when sitting; rising from sitting; leaning forward; walking; lying on her side, stomach, and back; driving; coughing; sneezing; bending forward; and sleeping. AR at 395. Plaintiff also reported her pain between eight (8) and ten (10) out of ten (10). *Id.* Plaintiff stated that physical therapy did not help, but made it worse. *Id.* Physical examination was generally unremarkable, but "[l]umbar range of motion shows 10° of flexion, 5° extension, limited torsion with pain[,] . . . pain with all ranges[,] . . . [and] with palpation over her L5 segment and posterior superior iliac spine." *Id.* at 396. MRI was noted to show "some mild disc dehydration and annular tearing at L5-S1[,] [and] . . . a slight amount of facet hypertrophy[,] [but] [o]therwise its normal." *Id.* at 396, 400. Dr. Brailsford-Gorman diagnosed low back pain and L5-S1 degenerative disease with a failure of conservative therapy. AR at 396. Accordingly, Dr. Brailsford-Gorman recommended weight loss and core strengthening, as well as epidural steroids. *Id.*

On September 15, 2011, Plaintiff received an L5-S1 interlaminar epidural steroid injections. *Id.* at 398–99. Scott Goorman, M.D. performed the procedure and reported that Plaintiff tolerated the procedure well, and there were no immediate complications. *Id.* at 398. On September 20, 2011, Plaintiff was seen by Albert Willison, ARNP for a follow-up visit regarding her diabetes mellitus and to review laboratory testing. *Id.* at 423–32. NP Willison reported that although Plaintiff was taking medications as prescribed, she was not monitoring her blood pressure or home glucose, watching her diet, or exercising. AR at 423. NP Willison reduced Plaintiff's B12 supplement, and noted that her Hgb A1c was high, but much improved, so recommended that she continue

with her diet. *Id.* at 423, 426. NP Willison also prescribed codeine and baclofen due to Plaintiff's complaint of increased back pain. *Id.* NP Willison's physical examination was otherwise unremarkable. *Id.* at 425.

On October 5, 2011, Plaintiff followed up with NP Willison regarding her lumbar back pain, diabetes mellitus, obesity, and asthma. *Id.* at 419–22. Plaintiff described her lower back pain as five (5) out of ten (10), with ten (10) being the worst possible pain. AR at 421. NP Willison's physical examination of Plaintiff was other unremarkable. *Id.* Plaintiff was advised to increase intake of fluids, and prescribed phentermine for weight loss. *Id.* at 422. On October 18, 2011, Plaintiff returned to Dr. Brailsford-Gorman for a recheck post lumbar epidural steroid. *Id.* at 433–34. Plaintiff reported her symptoms were generally improved, without new symptoms; however, she further reported suffering from significant pain at the time of the appointment. *Id.* at 433. Dr. Brailsford-Gorman's physically examination indicated sensory decrease distally; tenderness in the posterior iliac spine, left greater than right; range of motion decrease with side bending and extension, which increased Plaintiff's pain, especially on the left. AR at 433. Plaintiff's pain was worse at L5-S1 paraspinal. *Id.* Dr. Brailsford-Gorman recommended a trial of L5-S1 bilateral facet blocks. *Id.* at 434.

On November 5, 2011, Plaintiff returned to see NP Willison for a follow-up visit regarding her lumbar back pain, diabetes mellitus, obesity, and asthma. *Id.* at 415–18. Plaintiff reported having an anaphylactic reaction to the phentermine, and as such discontinued and withdrew from the clinic. *Id.* at 415. NP Willison's physical examination of Plaintiff was unremarkable, except for her report of lumbar pain continuing at five (5) out of ten (10). AR at 417.

On May 16, 2012, Plaintiff returned to Dr. Brailsford-Gorman regarding her bilateral lumbar spine pain. *Id.* at 435–37. Plaintiff scored her pain as seven (7) out of ten (10). *Id.* at 435. Plaintiff further reported that she was trying to exercise more, working out at a gym. *Id.* at 435. Dr. Brailsford-Gorman's physical examination of Plaintiff was unremarkable, except tenderness at L4/L5 and L5/S1; restricted and painful

extension; and rotation to the left and right were also restricted and painful. *Id.* at 436–37. Dr. Brailsford-Gorman further reported a negative straight leg raise test. AR at 437. Dr. Brailsford-Gorman recommended epidural steroid injections and facets L4/L5 and L5/S1. *Id.*

On June 14, 2012, NP McLeod completed a Physical Residual Functional Capacity Assessment ("RFC") for Plaintiff. *Id.* at 440. NP McLeod opined that Plaintiff could stand during an eight (8) hour day for two (2) hours or less; that she could sit for fifteen (15) to thirty (30) minutes or less at one time without needing to change position; and could walk less than one (1) block or less before needing to stop. *Id.* NP McLeod also opined that she could never lift and carry anything above ten (10) pounds. *Id.* NP McLeod limited Plaintiff to occasional reaching, meaning two (2) hours or less; and frequent, meaning between two (2) and six (6) hours per day, feeling, fingering, handling, and grasping. AR at 440. NP McLeod also stated that Plaintiff's limitations included a requirement to lie down during the day, as well as alternate sitting and standing every hour. *Id.* NP McLeod also opined that Plaintiff would miss more than five (5) days per month. *Id.* On June 19, 2012, Dr. Goorman performed bilateral facet blocks at L4/L5 and L5/S1 under fluoroscopic guidance. *Id.* at 438–39. Dr. Goorman's diagnoses included "[d]ebilitating low back pain, [l]umbosacral spondylosis, [l]umbar radiculopathy, [and] [f]acet [s]yndrome[.]" *Id.* at 438. Dr. Goorman reported that Plaintiff tolerated the procedure well without immediate complications. AR at 438.

On July 17, 2012, Plaintiff followed up with Dr. Brailsford-Gorman. *Id.* at 441–43. Plaintiff described her back pain as burning, as well as radiating to and throbbing in her left thigh. *Id.* at 441. Plaintiff stated that facet blocks were not effective, and epidural steroid injections helped for approximately one (1) month. *Id.* at 441. Dr. Brailsford-Gorman noted spasms in Plaintiff's upper back, and that she was uncomfortable with an antalgic gait. *Id.* at 442. Dr. Brailsford-Gorman noted restricted and painful flexion, extension, and rotation of the lumbar/sacral spine. AR at 443. Dr. Brailsford-Gorman further reported a positive Stork test, positive Trendelenburg's test,

and right sacroiliac less mobile, but negative straight leg raise on the right and left. *Id.* Dr. Brailsford-Gorman assessed a sacroiliac region sprain, lumbar disc degeneration, and lumbar spondylosis. *Id.* On July 26, 2012, Plaintiff had an MRI of her sacrum. *Id.* at 450. Taylor P. Chen, M.D. reported no abnormality was evident. *Id.* On July 31, 2012, Plaintiff returned to Dr. Brailsford-Gorman for a discussion regarding the results of diagnostic testing. AR at 444–46. Plaintiff reported a current pain level of nine (9) out of ten (10). *Id.* at 444. Dr. Brailsford-Gorman reported that she was unable to palpate Plaintiff's lumbar/sacral spine due to pain behaviors; flexion, extension, and rotation to both the right and left, were restricted and painful; equivocal Stork test; equivocal Trendelenburg's test; and negative straight leg raise on the right and left. *Id.* at 446. Dr. Brailsford-Gorman opined that the spine clinic did not have anything further to offer Plaintiff, because she did not benefit from injection, and her diagnostic studies do not suggest that there is a surgical treatment. *Id.* at 446.

On November 28, 2012, Plaintiff was seen by Dr. Brailsford-Gorman complaining of lower back pain bilaterally, radiating into her buttocks, and cramping in her calves. *Id.* at 447–49. Plaintiff also complained of arm pain radiating into her shoulderblades. AR at 447, 449. Plaintiff stated that her primary care physician sent her back for injections. *Id.* at 447. Dr. Brailsford-Gorman reported that Plaintiff appeared uncomfortable, and an antalgic gait was observed. *Id.* at 449. Dr. Brailsford-Gorman further reported that although Plaintiff's straight leg raise was negative bilaterally, her Trendelenburg test and SI compression test were positive bilaterally, and tenderness was documented at the greater trochanter and bursa bilaterally, the proximal iliotibial band bilaterally, and sacroiliac joint bilaterally. *Id.* Dr. Brailsford-Gorman opined that some of Plaintiff's symptoms were neuropathic, as well as musculoskeletal. *Id.*

On December 12, 2012, Plaintiff underwent nerve conduction velocity ("NCV") and electromyography ("EMG") tests. AR at 451. Eugene Y. Mar, M.D. reported that all nerve conduction studies were within normal limits, and all examined muscles showed no evidence of denervation. *Id.*

## b. Examining physicians

On October 5, 2010, Jeri B. Hassman, M.D. examined Plaintiff at the request of the Arizona Department of Economic Security ("AZDES"). AR at 357–64. Dr. Hassman noted Plaintiff's chief complaints as asthma, allergies, and eye problems. *Id.* at 357. Dr. Hassman summarized Plaintiff's medical records that she had reviewed regarding her eye surgeries and visit with the ENT specialist. *Id.* at 357–58. Dr. Hassman does not appear to have reviewed Plaintiff's other medical records. *See id.* at 357–58. Dr. Hassman's review of Plaintiff's systems indicated occasional headaches and low back pain, but no neck or mid-back pain. *Id.* at 358. Plaintiff also complained of occasional abdominal pain, but no nausea, vomiting, constipation, or diarrhea. AR at 358. Plaintiff stated that she had occasional double vision, although it had improved since the corrective surgery; however, she stated that she could not afford the $500.00 necessary for glasses. *Id.* Plaintiff denied chest or rib pain; dizziness; confusion; decreased memory; fatigue; depression; anxiety; or numbness or tingling of her arms, hands, or fingers or legs, feet, or toes. *Id.* at 358–59. Plaintiff did complain of occasional shortness of breath and frequent coughing. *Id.* at 358. Dr. Hassman's physical examination of Plaintiff was generally unremarkable, noting normal ambulation without any pain, normal heel strike, foot flat and heel off, and no limp. *Id.* at 359. Dr. Hassman reported that Plaintiff was able to stand and walk on her heels and on her toes, but refused trying to hop on either foot due to low back pain. AR at 359. Dr. Hassman further reported that Plaintiff was able to bend at the waist and knees, and pick up something from the floor, as well as kneel down on either knee and get up independently. *Id.* Dr. Hassman also reported that Plaintiff was independent in dressing and undressing, and also in getting on and off the examining table and in and out of the chair. *Id.* Dr. Hassman noted that Plaintiff could be heard coughing while in the waiting room, and she coughed "at least five or 10 times during the physical examination." *Id.* Dr. Hassman noted that Plaintiff indicated that she never coughed as much in a doctor's office as she did at home. *Id.* Dr. Hassman opined that Plaintiff's cough sounded benign, and was nonproductive. AR at 359. Dr. Hassman

indicated that Plaintiff's lungs were clear, although trying to take a deep breath caused Plaintiff to begin coughing. *Id.* Dr. Hassman reported patches of eczema on Plaintiff's left wrist and neck. *Id.* Examination of Plaintiff's upper extremities was also normal. *Id.* Dr. Hassman further reported that examination of Plaintiff's thoracic and lumbar spine did not indicate muscle spasm or hypertonicity of the paraspinal muscles, and Plaintiff had a full range of motion of the lumbar spine without pain, and straight leg raising test was negative bilaterally. *Id.* Examination of Plaintiff's lower extremities was also normal. AR at 360. Dr. Hassman's diagnoses included asthma and allergies resulting in persistent and frequent coughing which was unresponsive to treatment with inhalers, allergy shots, and other cough medications; morbid obesity; Type 2 diabetes mellitus; and previous history of medial rectus weakness in both eyes, with rare episodes of double vision, but continued pain in her right eye. *Id.* Dr. Hassman also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) regarding Plaintiff. *Id.* at 360–64. Dr. Hassman opined that Plaintiff did not have any restrictions in lifting or carrying. *Id.* at 361. Dr. Hassman further opined that Plaintiff was limited in standing and/or walking to between six (6) and eight (8) hours in an eight (8) hour day. *Id.* Dr. Hassman also found Plaintiff did not have any limitations on sitting. *Id.* at 362. Dr. Hassman opined that Plaintiff was unlimited in seeing, hearing, and speaking, as well as in reaching, handling, fingering, and feeling. *Id.* Dr. Hassman indicated that Plaintiff could occasionally climb ramps, stairs, ladder, rope, and scaffolds; stoop; kneel; crouch; and crawl. *Id*. Dr. Hassman also noted that Plaintiff was restricted in working around heights; extremes in temperature; chemicals; and dust, fumes, or gases. *Id.* at 362–63.

On October 28, 2010, Charles S. Gannon, M.D. examined Plaintiff at the request of AZDES. *Id.* at 365–68. Dr. Gannon noted normal pupillary reactions and internal examination. AR at 365. Dr. Gannon attributed Plaintiff's vision impairment to a small refractive error and intermittent exotropia. *Id.* Dr. Gannon opined that no recommendations were necessary at the time. *Id.* at 366. Dr. Gannon noted that Plaintiff did not have any noticeable problem ambulating due to her vision. *Id.* Dr. Gannon

reported that his findings were consistent with previous findings, and that Plaintiff's color vision was normal, and peripheral fields were within normal limits. *Id.*

### c. Nonexamining physicians

State agency physicians reviewed Plaintiff's medical records at both the initial level and on reconsideration. Marilyn Orenstein, M.D. reviewed Plaintiff's medical records at the initial level and gave great weight to the examining physicians. *See* AR at 52–64. Dr. Orenstein found Plaintiff to be partially credible, pointing to her alleged non-compliance. *Id.* at 59. Dr. Orenstein opined that Plaintiff had the following exertional limitations: lift or carry fifty (50) pounds occasionally; lift or carry twenty-five (25) frequently; stand and/or walk for approximately six (6) hours in an eight (8) hour workday; sit with normal breaks for approximately six (6) hours in an eight (8) hour workday; and otherwise unlimited in pushing or pulling. *Id.* at 60. Dr. Orenstein further opined that Plaintiff's postural limitations included the ability to frequently climb ramps and stairs; balance; stoop; kneel; crouch or crawl; and never climb ladders, ropes, and scaffolds. *Id.* Dr. Orenstein noted that Plaintiff did not have and manipulative, visual or communicative limitations, but had environmental limitations of requiring avoiding concentrated exposure to extreme cold and heat, vibration, fumes, odors, dusts, gases, and poor ventilation. *Id.* Dr. Orenstein further noted that Plaintiff should avoid even moderate exposure to hazards, but was unlimited regarding wetness, humidity, and noise. AR at 60. Dr. Orenstein also noted that Plaintiff had never been hospitalized for exacerbations of asthma. *Id.* at 62.

Upon reconsideration, Robert Hirsch, M.D. reviewed Plaintiff's medical records. *Id.* at 65–77. Dr. Hirsch's RFC was identical to that of Dr. Orenstein. *See id.* at 72–74.

## II. STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may

"set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III. ANALYSIS

### A. The Five-Step Evaluation

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). This process is defined as follows: Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]" If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past

relevant work.  If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience.  If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2013, and was not engaged in substantial gainful activity since her alleged onset date of November 2, 2010.  AR at 15.  At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: chronic back pain, diabetes, cough, obesity, asthma[,] and status post left knee surgery (20 CFR 404.1520(c))."  *Id.*  At step three, the ALJ found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526)."  *Id.* at 16.  Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) specifically as follows: the claimant can lift and carry fifty pounds occasionally and twenty-five pounds frequently; the claimant can stand and/or walk six hours in an eight-hour workday and sit for six hours in an eight-hour workday; the claimant cannot climb ladders, ropes or scaffolds; the claimant can frequently climb ramps and stairs and balance, stoop, kneel, crouch and crawl; the claimant must avoid concentrated exposure to extreme heat, cold, vibration, fumes, odors, dust, gases, poor ventilation and hazards, and the claimant must avoid working with the public."  *Id.*  At step four, the ALJ found that "[t]he claimant is unable to perform any past relevant work (20 CFR 404.1565)."  *Id.* at 19.  At step five, the ALJ considered "the claimant's age, education, work experience, and residual functional capacity, [and found] there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a))."  AR at 20.  Accordingly, the ALJ determined that Plaintiff was not disabled.  *Id.* at 21.

Plaintiff asserts that the ALJ erred in her consideration of substantial evidence in the record regarding medical treatment and compliance, negatively impacting her assessment of Plaintiff's credibility; giving improper weight and consideration to reports of Plaintiff's activities of daily living; improperly giving significant weight to the examining consultant's opinion prior to the alleged onset date; and improperly weighing the testimony of Nurse Practitioner Kathleen McLeod. Pl.'s Opening Br. (Doc. 17) at 11–17.

### B.     *Plaintiff's Symptoms*

#### 1. Legal standard

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'" *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014). Further, "the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282). "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and

convincing" requirement had been excised by prior Ninth Circuit case law). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

"Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and 'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment.'" *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)); *see also Ghanim*, 763 F.3d at 1163. The Ninth Circuit Court of Appeals has "repeatedly warned[, however,] that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016 (citations omitted). Furthermore, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1287 n. 7 (citations omitted). The Ninth Circuit Court of Appeals has noted:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Garrison*, 759 F.3d at 1016 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)) (alterations in original). "While ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard." *Id.* at 1018 (emphasis in original) (discussing mental health

records specifically). "Inconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination. *Burrell*, 775 F.3d at 1137 (citing *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

### 2. ALJ findings

Here, the ALJ acknowledged the two-step process for assessing Plaintiff's symptom testimony. AR at 16. The ALJ then found "[a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent those statements are inconsistent with the residual functional capacity assessment herein." *Id.* at 17. The ALJ went on to review the medical record concluding "[t]he claimant's subjective complaints are less than fully credible and the objective medical evidence does not support the alleged severity of the symptoms." *Id.* at 19.

As the Ninth Circuit Court of Appeals has recently observed:

> The ALJ took a backward approach to determining [Plaintiff's] credibility. [She] found that [Plaintiff's] testimony was not credible "to the extent [it was] inconsistent with the . . . [RFC]." However, and ALJ must take into account a claimant's symptom testimony when determining the RFC. *Laborin v. Berryhill*, 867 F.3d 1151, 1154 (9th Cir. 2017); *Trevizo v. Berryhill*, 862 F.3d 987, 1000 n.6 (9th Cir. 2017). To determine the RFC *first* and *then* the claimant's testimony is to "put[] the cart before the horse." *Laborin*, 867 F.3d at 1154. The ALJ's approach is "inconsistent with the Social Security Act and should not be used in disability decisions." *Id.* at 1153; *see also Trevizo*, 862 F.3d at 1000 n.6. Though this may not itself be reversible error, when taken together with the ALJ's failure to provide "clear and convincing" reasons for rejecting [Plaintiff's] testimony, we cannot conclude anything other than that the ALJ's failure to credit [Plaintiff's] testimony was error.

*Revels v. Berryhill*, 874 F.3d 648, 666 (9th Cir. 2017) (emphasis in original) (alterations 4–6 in original). Moreover, "the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need

only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282). "[A]n ALJ may not disregard [a claimant's testimony] solely because it is not substantiated by objective medical evidence[.]" *Trevizo*, 871 F.3d at 679 (citations omitted). The ALJ's finding that objective medical evidence did not support the alleged severity of the symptoms is inconsistent with Plaintiff's burden.

### a. Activities of daily living

The ALJ is reminded that "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1287 n.7 (citations omitted). Although Plaintiff may be able to manage living on her own and keep her children fed, clothed, and medicated, this does not necessarily equate with the ability to work. *Trevizo*, 871 F.3d at 682 ("[T]he mere fact that she cares for small children does not constitute an adequately specific conflict with her reported limitations."); *Garrison*, 759 F.3d at 1016 (impairments that would preclude work are often consistent with doing more than spending each day in bed). Furthermore, Plaintiff consistently testified that her family assists her with her children and housework. AR at 38, 180, 200. The ALJ also found Plaintiff's adoption of a newborn inconsistent with her disability. *Id.* at 17. The ALJ ignored the fact that Plaintiff told her primary care provider that she had gained custody of her seventeen year old niece and her niece's three month old son, but her niece had run away leaving Plaintiff with the baby. *Id.* at 342. Additionally, Plaintiff testified that her driving is limited, as is her ability to perform tasks such as grocery shopping. *Id*. at 35, 181, 201. The evidence does not support the ALJ's finding that "the claimant has engaged in a somewhat normal level of daily activity and interaction[,] . . . [and] [her]

ability to participate in such activities undermined the credibility of the claimant's allegations of disabling functional limitations." *Id.* at 17.

### b. Treatment compliance

"Failure to follow prescribed treatment may cast doubt on the sincerity of the claimant's pain testimony." *Trevizo*, 871 F.3d at 680 (quotations and citations omitted). The ALJ stated that "[i]t was noted that the claimant did not take her medications as prescribes [sic] or monitor her blood sugar levels[,] [and] [t]he claimant was also not compliant with her diet and exercise program." AR at 17. The ALJ misstated the record. NP Willison plainly stated that "[t]he patient **is taking medications as prescribed**." *Id.* at 423 (emphasis added). He further noted that "[h]er Hgb A1c was high but much improved **so we will continue with same diet**." *Id.* (emphasis added). Moreover, when NP Willison prescribed Plaintiff phentermine for weight loss, she suffered an anaphylactic reaction to the drug. *Id.* at 415, 417, 422. As such, the ALJ's findings regarding non-compliance are not supported by the record.

### c. Conservative treatment

The ALJ noted that "[t]he medical evidence indicates the claimant received routine conservative treatment for complaints of asthma, allergies and back pain[,] [and] [t]he lack of more aggressive treatment or surgical intervention suggests the claimant's symptoms and limitations were not as severe as she alleged." AR at 17. Evidence of conservative treatment is a proper reason to discount a claimant's pain testimony. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations omitted). Plaintiff received allergy shots, which she had an adverse reaction to, for treatment of her allergies; used multiple inhalers for treatment of her asthma; received epidural steroid injections and facet blocks for her back pain when physical therapy and medication failed; and was deemed not to be a candidate for surgical intervention. The ALJ failed to explain how these treatments are "conservative" for Plaintiff's diagnoses. The Ninth Circuit Court of Appeals has "previously 'doubt[ed] that epidural steroid shots to the neck and lower back qualify as 'conservative' medical treatment.'" *Revels*, 874 F.3d at

667 (citing *Garrison*, 759 F.3d at 1015 n.20).  As such, the Court finds that Plaintiff's treatment choices "do[] not constitute substantial evidence supporting a finding that [Plaintiff's] symptoms were not as severe as [she] testified, particularly in light of the extensive medical record objectively verifying [her] claims." *Trevizo*, 871 F.3d at 682.

### d. ENT physician

The ALJ stated that a "doctor indicated that the claimant did not need ant [sic] significant intervention from a specialist[,]" and relied on this finding to discredit Plaintiff's testimony.  AR at 17.  Dr. Emami, an ENT, noted that there was no "need for any significant ENT intervention[.]" *Id.* at 251.  It does not follow that because there was no structural reason for Plaintiff's cough, she is not credible.  Plaintiff has an extensive list of allergies which contributed to her symptoms.  Substantial evidence does not support the ALJ's finding.

### e. Consultative Examiner

The ALJ noted that consultative examiner Dr. Hassman reported that Plaintiff's physical examination was unremarkable beyond her cough and patches of eczema.  AR at 18.  The ALJ further noted Dr. Hassman's findings that "[a] neurological examination showed normal motor strength, sensation, and reflexes." *Id.*  As an initial matter, Dr. Hassman examined Plaintiff prior to her alleged onset date, and before her back pain had significantly progressed.  Additionally, Dr. Hassman noted that Plaintiff could be heard coughing in the waiting room, and coughed five (5) or ten (10) times during her examination. *Id.* at 359.  Dr. Hassman also appears to have reviewed only a subset of Plaintiff's medical records. *Id.* at 357–58.  As such, Dr. Hassman's notes from a single meeting are insufficient to disregard Plaintiff's testimony. *See Trevizo*, 871 F.3d at 680 ("clear and convincing" reasons required for crediting the opinion of an examining doctor over primary treating physician and claimant's testimony).

### f. Conclusion

Based upon the foregoing, the Court finds that the ALJ failed to provide specific, clear and convincing reasons for discounting Plaintiff's testimony which are supported by

substantial evidence in the record. *See Lingenfelter*, 504 F.3d at 1036; *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008).

### C. Nurse Practitioner McLeod

Plaintiff asserts that the ALJ improperly weighed NP McLeod's opinion. Pl.'s Opening Br. (Doc. 17) at 16–17. The ALJ stated that she considered the opinion of NP McLeod, but "[b]ecause this opinion is not from an acceptable medical source, the undersigned gives it less weight than other qualifying medical source opinions (20 CFR 404.1513(a)(e) and 416.913(a)(e))." AR at 19. Without elaboration, the ALJ also found NP McLeod's opinion "inconsistent with the medical records and the claimant's activities of daily living." *Id.* 19.

The Ninth Circuit Court of Appeals has opined that "[t]he Social Security regulations provide an out-dated view that consider a nurse practitioner as an 'other source.'" *Popa v. Berryhill*, 872 F.3d 901, 907 (9th Cir. 2017). NP McLeod treated Plaintiff at least eight (8) times over two (2) years.[1] Furthermore, NP McLeod "was in a unique position as a primary care provider, as she received reports from specialists and had an overview of [Plaintiff's] conditions." *Revels*, 874 F.3d at 665 (citing 20 C.F.R. § 404.1527(c)(2)(ii)). Ninth Circuit "precedents require that the ALJ provide 'germane reasons' to reject [NP McLeod's] opinions. *Popa*, 872 F.3d at 907 (citing *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012)). "The ALJ failed to provide 'germane reasons.'" *Id.* Because the Court will direct the ALJ to reassess her credibility findings with regard to Plaintiff, it finds that it is appropriate to direct her to reconsider NP McLeod's statements in light of the new determination.

### D. Remand for Further Proceedings

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)).

---

[1] NP McLeod's completion of the RFC paperwork represents a ninth visit in two and half years.

"Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)). Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke,* 379 F.3d at 593 (citations omitted). Where the test is met, "we will not remand solely to allow the ALJ to make specific findings. . . . Rather, we take the relevant testimony to be established as true and remand for an award of benefits." *Id.* (citations omitted); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). "Even if those requirements are met, though, we retain 'flexibility' in determining the appropriate remedy." *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014).

Here, the ALJ committed legal error in rejecting Plaintiff's symptom testimony, and discounting Plaintiff's treating provider's opinion. The Court finds that remand on an open record is appropriate in this case. The ALJ is instructed to reassess Plaintiff's symptom testimony, as well as reassess Plaintiff's activities of daily living and the limitations that they impose based on her revised analysis of Plaintiff's symptoms. The ALJ is also instructed to reassess NP McLeod's opinions consistent with this Order. The ALJ shall also consider any additional medical records that may be available. Finally, reassessment of Plaintiff's testimony may impact the VE testimony and require additional inquiry. *See Matthews v. Shalala,* 10 F.3d 678, 681 (9th Cir. 1993) ("[i]f a vocational expert's hypothetical does not reflect all the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy." (internal quotation marks and citation omitted)).

## V. CONCLUSION

In light of the foregoing, the Court REVERSES the ALJ's decision and the case is

REMANDED for further proceedings consistent with this decision.

Accordingly, IT IS HEREBY ORDERED that:

1)    Plaintiff's Opening Brief (Doc. 17) is GRANTED;

2)    The Commissioner's decision is REVERSED and REMANDED;

3)    Upon remand, the Appeals Council will remand the case back to the ALJ on an open record; and

4)    The Clerk of the Court shall enter judgment, and close its file in this matter.

Dated this 26th day of March, 2018.

Honorable Bruce G. Macdonald
United States Magistrate Judge